COTTER v. ALABAMA G. S. R. CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1894.)

No. 149.

1. WRIT OF ERROR — AMENDMENT BY CIRCUIT COURT OF APPEALS—SEAL—RETURN WITH TRANSCRIPT OF RECORD.

As power to amend a writ of error, under Rev. St. § 1005, is conferred by Act March 3, 1891, § 11, on a circuit court of appeals, that court may affix its seal to such a writ, formal in all respects save absence of a seal; and the operation of such a writ is not defeated by the fact that it is not returned attached to the transcript of the record, where it is returned on the day the transcript is filed, indorsed as executed by sending the transcript as commanded, for the defect may be amended.

2. SAME.

Under the act of March 3, 1891, creating the circuit court of appeals, writs of error from that court to the circuit and district courts are sued out under the same practice and regulations as in cases of writs from the supreme court.

3. TRIAL—DIRECTION OF VERDICT—NEGLIGENCE OF RAILROAD COMPANY.

In an action against a railroad company for the death of a locomotive engineer by derailment of his engine, plaintiff's theory was that the derailment was caused by the loosening of the rails by defendant's section men. All the testimony was that the rails on which the men had worked were on the west side only of the track. Three trains had passed safely over the rails before deceased's train. That train went off the track on the east side. An examination made immediately afterwards, showed that a rail on the east side had been displaced several inches, and the inference from the circumstances was that this had been done maliciously for the purpose of wrecking this train. Held, that there was no error in directing a verdict for defendant.

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

This was an action by William Cotter, administrator of John T. Cotter, deceased, against the Alabama Great Southern Railroad Company, for damages for the death of said John T. Cotter.   At the trial the court directed a verdict for defendant.   Judgment for defendant was entered thereon.   Plaintiff brought error.

C. Marchbanks, for plaintiff in error.

Edward Colston and Lewis Shepherd, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

LURTON, Circuit Judge.   This cause came on first to be heard upon the motion of the appellee to strike the case from the docket for the want of a writ of error, and the motion of the appellant to be allowed to amend the writ of error by having the seal of the court placed thereon.

This court can have no jurisdiction to review a cause decided in the circuit court unless it has been brought here in substantial conformity to some act of congress.   Castro v. U. S., 3 Wall. 46.   A writ of error has been defined by the supreme court, speaking through Chief Justice Marshall, as "a commission by which the, judges of one court are authorized to examine a record upon which a judgment was given in another court, and on such examination to affirm or reverse the same according to law."   Cohens v. Virginia, 6 Wheat. 409.   Congress has provided, by the act of March 3, 1891 (sections 6, 11), for the review of causes decided in existing circuit and district courts by this court by appeal, or by writ of error.   The latter section, after referring to the time within which such review may be had, provides that "all provisions of law now in force regulating the methods and system of review through appeals or writs of error, shall regulate the method and system of appeals and writs of error provided for in this act in respect of the circuit court of appeals, including all provisions for bonds or other securities to be required and taken on such appeals and writs of error."   It follows that under the act just cited writs of error from this court to circuit and district courts are sued out under the same practice and regulation as in cases of writs from the supreme court.   It is also obvious that the power conferred upon the supreme court by section 1005, Rev. St., concerning the amendment of defective writs in matters of form, is likewise conferred upon this court with respect to writs of error issuing from this court.

Prior to 1791 it was the practice that a writ of error could only issue from the office of the clerk of the supreme court.   In Mussina v. Cavazos, 6 Wall. 355, it is stated that a decision to that effect in West v. Barnes (in 1791) 2 Dall. 401, led to the enactment of the ninth section of the act of 1792, being section 1004 of the Revised Statutes.   That section is as follows:

"Sec. 1004. Writs of error returnable to the supreme court may be issued as well by the clerks of the circuit courts, under the seals thereof, as by the clerk of the supreme court.   When so issued, they shall be, as nearly as each case may admit, agreeable to the form of writ of error transmitted to the

clerks of the several circuit courts by the clerk of the supreme court, in pursuance of section nine of the act of May eight, seventeen hundred and ninety-two, chapter thirty-six."

Since that act the writ may issue by the clerks of the circuit or district courts, under the seals of their respective courts. That the writ shall be under seal is as essential now as before. As observed by Mr. Justice Miller, in regard to writs so issued by clerks of such courts:

"Such writ is in form and fact the process of this court, directed to the judges of the circuit court, commanding them to return with said writ, into this court, a transcript of the record of the case, mentioned in the writ. When deposited with the clerk of the court, to whose judge it is directed, it is served; and the transcript which the clerk sends here is the return to the writ, and should be accompanied by it." Mussina v. Cavazos, 6 Wall. 355.

The writ of error allowed in this case is not attached to the transcript, nor made a part of the record. It was, however, returned to this court on the day the transcript was filed here, indorsed as executed, by sending the transcript to this court as commanded. We think the mere fact that it was not returned attached to the transcript does not render it void, inasmuch as it has performed its function, and may be now attached to the record sent here, as should have been done in the first instance. Its actual issuance and service, it being in form a colorable command in the form required by the statute, have operated to give this court jurisdiction, and under section 1005 we may amend it in all matters of formal defect. Its operation as a writ of error is not defeated by the mere failure of the clerk to send up the transcript "accompanied by it."

In the case of Mussina v. Cavazos, cited above, the writ never was returned. It was issued and served. The transcript was sent up unaccompanied by the writ, because it was accidentally destroyed before the record was made out. Concerning an objection to the jurisdiction because the original writ had not been returned as required by section 1004, the court said:

"It fully appears that during the life of the writ a good and sufficient return to it was made by sending to this court an authenticated transcript of the record. Shall we now hold, because with this return there did not come the writ itself, that what has been done under it is void, and we are without jurisdiction? This would be contrary to the uniform practice of other courts in regard to their writs, for it is believed to be well settled that rights acquired under a valid writ of process, while it was in force, cannot be defeated by the loss or destruction of the writ, if its existence, and the acts done under it, can be substantiated by other testimony. It is as reasonable to hold that a judge of this court would lose his right to sit in this place if his commission was burned up as to hold that the court loses the right to hear a case because the writ was burned before it reached the court, but after it had effected its purpose, by bringing here the transcript."

Another objection made is that the writ has no seal. Prior to the enactment of section 1005, Rev. St., this would be a fatal objection to its validity and to the exercise of any jurisdiction over the case by this court. Overton v. Cheek, 22 How. 46. That section is in these words:

"Sec. 1005. The supreme court may, at any time, in its discretion and upon such terms as it may deem just, allow an amendment of a writ of error, when

there is a mistake in the test of the writ, or a seal to the writ is wanting, or when a writ is made returnable on a day other than the day of the commencement of the term next ensuing the issue of the writ, or when the statement of the title of the action or parties thereto in the writ is defective, if the defect can be remedied by reference to the accompanying record, and in all other particulars of form; provided, the defect has not prejudiced, and the amendment will not injure, the defendant in error."

That section is from the act of June 1, 1872.

The cases cited by the learned counsel, of Insurance Co. v. Mordecia, 21 How. 195, and Hodge v. Williams, 22 How. 87, were decided before that act, and doubtless led to its passage. The power to permit the amendment of a defective writ conferred by that provision is very liberal. Neither is it fatal that more than six months have passed since the final decree sought to be reviewed was pronounced. The statute allows the amendment "at any time," in the discretion of the court. The theory of the act is that a colorable writ shall operate as a writ of error, the court being given the power to amend it in so far as it is informal. The amendment relates back to its original issuance, and presupposes jurisdiction from date of original allowance. In Insurance Co. v. Pendleton, 115 U. S. 339, 6 Sup. Ct. 74, the defect in the writ was not discovered until after final judgment, which judgment was set aside, the writ amended, and new citation ordered. This right of amendment is not an absolute one. It rests in the sound discretion of the court, and upon such terms as the court may deem just. Pearson v. Yewdall, 95 U. S. 294. So a writ of error may be so void of color as a writ from the appellate court as to be unamendable. This was the case in Bondurant v. Watson, 103 U. S. 278. In that case it did not purport to be issued under authority of the supreme court of the United States, or of the president of the United States. It was the mere command of the chief justice of the supreme court of Louisiana, under his teste and the seal of his court, to send the transcript to the supreme court of the United States. That writ was held not to be even a colorable writ, and therefore unamendable. In the later case of Railway Co. v. Kirk, 111 U. S. 486, 4 Sup. Ct. 500, the writ ran in the name of the president of the United States, as prescribed by the form prepared under the act of 1792. It was defective, in that it was not tested by the chief justice of the United States, nor signed by the clerk of the supreme court of the United States, and did not bear the seal of either the supreme court or the circuit court. In place of these formalities it was tested by the chief justice of the supreme court of Texas, signed by the clerk of the supreme court of Texas, and sealed with the seal of that court. The court held that, as it purported to run in the name of the president of the United States, it was a colorable writ, and subject to amendment. The writ under which the transcript of this cause was sent here is in all respects formal save in the absence of a seal. The seal of this court may now be affixed, which, being accordingly done, the case is heard on its merits.

Upon the conclusion of all the evidence, the circuit judge instructed the jury to bring in a verdict for the defendant. The only error assigned is upon this instruction. The contention of appel-

lant is that there was such a conflict in the evidence bearing upon the responsibility of the appellee for the death of the intestate as to make it a proper case to go to the jury. The deceased, John T. Cotter, was a locomotive engineer in the service of the Alabama Great Southern Railroad Company. The train being pulled by his engine was derailed on the night of April 20, 1891, and he was killed. This action was brought by his administrator to recover damages for his death as resulting from the negligence of the company in whose service he was. The theory of the plaintiff was that the track, at place of derailment, had been left in an unsafe and dangerous condition by the section men at work there on the previous evening, and that the derailment was a consequence of that condition. In support of this theory there was evidence showing that at or near the place of derailment there had been some "bucking" or springing of the rails, caused by expansion under the sun's heat. This condition is brought about by the tightness or closeness of the joints, there being insufficient play for the rails when lengthened by the expansion. The evidence shows that it is relieved by putting in a split or pointed rail so shaped as to slip by the end of the rail in contact with the pointed end, thus permitting expansion. To permit the warped or "bucked" rails opportunity for adjustment, there was proof that it was customary to loosen the fish-bar bolts, and draw out the joint or check spikes, and leave them out for a few hours, until the "bucked" condition had been relieved. While the joint bolts and spikes are out, the rail is secured in place only by the spikes on each side of the rail, and in each tie under the rail. The evening before this accident the track supervisor had caused a split rail to be put in at a point somewhere near the place of derailment. He had also had the joint bolts loosened, and the joint spikes drawn out, so as to facilitate the readjustment of the "bucked" rails. The work was completed at dusk, and the track left in that condition for the night. Expert testimony differed as to whether the track was safe in the condition thus left. The case did not, however, turn upon that question. The circuit judge said to the jury that there was no evidence "that the rails whose spikes had been drawn out at this point, or that the loosening of those bolts in the fish-bar joint connections, had produced the death of the intestate." The contention is that there was evidence from which the jury might rightfully infer that the derailment was produced by the condition in which those rails had been left. We have carefully examined the evidence bearing upon this point and upon the cause of the derailment. From that examination we are entirely satisfied that there was no evidence which would have warranted a verdict for the plaintiff. All the testimony shows that the rails which had been left in the alleged dangerous condition were on the west side of the track. All the work done the previous evening was on the west side of the track. Nor is there any evidence to establish the fact that the derailment occurred at the place where this work had been done. That the section men had worked up to within perhaps 50 feet of the place

of the accident is probable. That they had worked any nearer is not shown. In saying this we are not unmindful of the fact that there was a scintilla of evidence from which it might be inferred that the rails had been loosened near the place of derailment. That evidence is, however, so vague and so unsatisfactory that no verdict should stand based upon it. But, however this may be, there was still a total failure of evidence that the suspected rails caused or contributed to cause the derailment. The train went off the track on the east side. An examination was at once made as to the cause of the derailment. This developed the fact that a rail had been displaced on the east side. The bolts and spikes holding this rail had been removed, and were lying at the point where taken out. A crowbar and a wrench were on the track near by, which had evidently been used in taking out that rail. These tools were part of those left in the bushes on the side of the track the night before. After the spikes had been drawn and the joint bolts taken out, the indications were that the rail had been set out of alignment some five or six inches, and nearer the end of the ties. The wheel marks on the ties began just where this displaced rail had lain, and followed the bed of the rail north to the next rail. There the wheels had nibbed the corners of the next rail and deflected to the outside. After running on the ties some 90 feet, gradually getting further and further from the east rail, the engine went off the fill, and turned over. The evidence that no spikes or bolts had been drawn from any rail on the east side is undisputed in the proof. Late that evening it is shown that the rails on the east side had been examined, and from none had any bolts or spikes been drawn. There was no indication of disturbance of any of the rails on the west side, and no displacement of any rail which had been worked on the evening before. No less than three trains had safely passed over these rails before the train in charge of intestate. The inference is that a rail had been maliciously displaced on the east side of the track after the passage of the last train for the purpose of wrecking this train. The evidence wholly failing to show that the condition in which the track was left the evening before had anything to do with the derailment on the opposite side of the track, we therefore think there was no error in directing the jury to return a verdict for the defendant.

The judgment is accordingly affirmed.